Hitchcock, J.
This is a case of very considerable importance both on account of the value of the property, and of the principles" involved. It has been argued at great length and with much ability by the counsel concerned, and it is certainly involved in some doubt. It is believed, however, that if *422 we apply to it the ordinary rules of law, governing cases of ^is description, there can be no insurmountable difficulty in coming to a decision.
The facts as well as the law of the case were submitted to the decision of the Court below, and taking the assignment of errors as indicating the cause of complaint of the plaintiff in error, that complaint is not so much that the Court violated any principle of law, in the decision of any particular point, as that upon the whole case the Court came to a wrong conclusion. In the argument, however, objections are raised to many items of evidence, or rather to the effect which was given by the Court below to these items of evidence, which objections will be considered in the progress of the examination of the case.
The bill of exceptions, together with the documents therein referred to, show, that on the trial the lessors of the plaintiff proved that they were the lineal heirs of Thomas Cochran, and that he died the latter part of June, 1801. That before his decease he was the legal owner of the premises in controversy, that he left Cincinnati in January, 1801, and with his family arrived at Natchez and there remained until his death. That from the time of this removal they have been non-residents of the Northwestern Territory, and of the State of Ohio until the year 1840, with the exception of one of them, who visited Cincinnati in 1827.
Having proved these facts the plaintiff rested, and the defendants to prove title in themselves, introduced the record of a suit in attachment in favor of James Smith and James Findlay, instituted in the Court of Common Pleas of Hamilton county, in February, 1801, against the said Thomas Cochran, in virtue . of which the premises in controversy were attached, and such further proceedings were had, that the premises were eventually sold, and conveyed to James Findley under whom the defendants claim title; ' ‘
To this record many objections were made, and it is insisted by counsel for plaintiff in error that the whole proceeding is without authority of law, and utterly null and void. If so, *423 the premises in controversy still remain, from aught that appears in this case, the property of the lessors of the plaintiffs, and the judgment of the Superior Court must be reversed. if on the other hand the judgment is merely voidable on account of error, it cannot be impeached in this collateral manner, no matter how numerous the errors.
The principle we understand, is this, a title acquired under a void judgment cannot be sustained; a title acquired under an erroneous judgment will be sustained so long as the judgment remains in force. And under our system the reversal of a judgment will not defeat a title acquired while the judgment is in force. Whether a judgment is voidable depends generally upon the question whether the Court rendering the judgment has jurisdiction. In the case of Lessee of Paine v. Moreland, (15 Ohio Rep. 445,) this Court say: “The distinction is between the lack of power or want of jurisdiction in the Court, and a wrongful or defective execution of power. In the first instance all acts of the Court not having jurisdiction or power are void, in the latter voidable only. A Court then, may act, first, without power or jurisdiction; second, having power or jurisdiction, may exercise it wrongfully; or third, irregularly. In the first instance, the act or judgment of the Court is wholly void, and is as though it had not been done. The second is wrong and must be reversed upon error. ■ The third is irregular, and must be corrected by motion.”
This distinction between void and voidable, as applied to judicial proceedings, seems to be fully admitted by counsel, and the effect is to show that the proceeding in the case before the Court is utterly void. The first position assumed is that there was no law, at the time these proceedings .began, authorizing them, and therefore they are void. These proceedings were commenced during the existence of the Territorial Government, and it is not denied but that attachment laws had been adopted by the Governor and Judges, but it is denied that these officials had power to adopt them. The Ordinance for the government of the Territory provides that “ the Governor *424 and Judges, or a majority of them, shall adopt and publish in district, such laws of the original States, civil and criminal, may be necessary, and best suited to the circumstances of the district, and report them to Congress from time to time, which laws shall be in force in the district until the organization of the General Assembly, therein, unless disapproved by Congress; but afterwards the Legislature shall have authority to alter them as they shall see fit.” In this clause there is no restriction, but discretionary power is given to adopt such laws as may be necessary, subject however, to the disapproval of Congress.
In pursuance of the power thus conferred, the Governor and Judges, on the 1st day of June, 1795, adopted from the statutes of Pennsylvania, two laws, one “ allowing domestic attachments,” and the other “ regulating domestic attachments,” to take effect on the 15th of August of the same year. (Chase’s Stat. 141.) On the 15th July of the same year, a law was adopted from the statutes of New Jersey, “ allowing foreign attachments,” to take effect from the first of October next following. These laws remained in force, dr were supposed to remain in force, until subsequently repealed by the proper authority. They were recognized as binding by the Courts of the Territory, and many judicial proceedings were had under them. I infer this from the facts disclosed in the record before us, that in searching the newspapers to ascertain whether publication of notice in the case of Smith and Findley v. Cochran, had been made, frequent publications of notices of the pendency of other suits in attachment were found. And a decision that these laws were all void, destroys the foundation of the other suits, as well as of the one now more immediately before the Court.
One of the objections to these laws as I understand it, is that they provide for proceedings not according to the course of the common law, and reference is had to the second of the articles of compact prescribed in the ordinance of 1787. (Ch. Stat. 58.) That article, so far as this question is concerned, is *425 as follows: “ The inhabitants of said Territory shall always be entitled to the benefit of the writ of Habeas Corpus, and of the trial by jury; of a proportionate representation of people in the Legislature, and of judicial proceedings, according to the course of the common law.” This article follows a declaration in the ordinance to this effect: “It is hereby ordained and declared, by the authority aforesaid, that the' following articles shall be considered as articles of compact between the original States, and the people and States in the said Territory, and forever remain unalterable, unless by common consent.” The principles declared in these articles, and they are of a similar character to principles declared in a bill of rights, are to prevail not only during the Territorial government, but for all coming time. They must “forever remain unaltered.” By the Constitution of the State, in the 8th section of the 8th article it is declared, “ That the right of trial by jury shall be inviolate,” an expression similar to the one cited from the Ordinance. If it be a valid objection to the Territorial attachment laws, that they authorized proceedings not according to the common law, and are therefore void, the same objection lies against the attachment laws enacted by the State Legislature, especially those previous to 1810. This description of laws have existed and been enforced, however, since 1795, and it seems to the Court that it is now too late to question their validity, or rather constitutionality. The construction put upon the ordinance by counsel is too narrow. True, the right of trial by jury is guarded, but it could never have been intended that in every possible case it should have been enjoyed. Judicial proceedings according to the course of the common law, are secured, but this never could have been intended so to restrict the future legislative power of the Territory or State, that chancery proceedings could not be authorized, or any other proceedings necessary to the ends of justice. Proceedings by attachment are not, it is true, according to the course of the common law. They are under our system, proceedings in rem, intended to subject the property of a debtor to the payment of his debts. But in most *426 if not all our laws upon this subject, ample provision has been made for a defendant to come in, make defence, and have a as in other cases. Besides, had these laws been inconsistent with the ordinance, we may well suppose the same would have been disapproved by the Government of the United States. From all these considerations we are of opinion that the Governor and Judges had power to adopt attachment, as well as other laws.
Another objection made, in substance, is that the law under which the proceedings in attachment were bad, was void for uncertainty, and therefore proceedings under it could not be sustained. The uncertainty consists in this, that the mode of proceeding is not prescribed in the law itself, but reference is made to another law to ascertain this mode of proceeding, and it is said no such other law' was in existence. This objection requires of us to examine the several laws upon the subject. As before stated, on the 1st June, 1795, two laws were adopted from the statutes of Pennsylvania, one “ allowing domestic attachments,” and' the other “ regulating domestic attachments.” By the first of these laws, an attachment might be issued against the goods and chattels of a defendant, but such attachment was not to be issued except against such person or person’s effects, ■ as at the time of granting such writs, were not residents of the territory, or were about to remove, or make their escape out of the same; (Chase’s st. 141.) This seems to have been a proceeding under which the property of a defendant was seized, to compel his appearance in Court, and to secure the debt due. Upon the appearance of defendant, and the entry of special bail, the case was proceeded in, as if personal -service of process had been made. The seizure of ' the goods, under the attachment, gave the Court jurisdiction.
The law regulating domestic attachments seems to have been designed, in its first section, to confer jurisdiction by this description of process upon justices of the peace. But in the. second section, it is provided that if upon examination the justice shall find, “ that there is a just debt due to any one person *427 from the defendant, exceeding the sum of twelve dollars, then, and in every such case, the said justice of the peace shall further proceed, but shall deliver and certify to the Prothonatory of the Court of Common Pleas, for the same, the said attachments, and all the proceedings thereon.” . This being done, the Justices of the Court of Common Pleas are authorized to issue an attachment “ to the sheriff of the county, directing him to attach all the goods, chattels, rights and interests, lands, tenements and hereditaments, of the said defendant, within his bailiwick; ” (Chase’s st. 142.) The next law upon this subject was adopted from the statutes of New Jersey, on the 15th July, 1795, allowing foreign attachments; (Chase’s stat. 197.) The first section provides that the lands, tenements, goods, chattels, &c., of a person or persons not resident of the territory, may be attached for the payment of any just debt, &c., by writ or writs issued out of the General Court, any Circuit Court, or Court of Common Pleas; “ and as early as may be, shall and may be proceeded against, in the same manner as is directed against the lands, tenements, hereditaments, and estates of absconding'debtors, except where otherwise herein directed.”
It is urged by plaintiff’s counsel that there was no such law in force as is here referred to, as appliable to the estates of abr sconding debtors; and that therefore this was a void enactment. The only law in force, so far as appears upon the statute book, relative to attaching the lands of an absconding debtor, is the second section of the act before referred to, “ regulating domestic attachments.” There might have been some other adopted, but not published; or if published, it may not have got into the statute book. But does it therefore follow that if there was no such law, the lawof the 15th July, 1795, must be void? The imperfection of a law will not render it void, unless it is so imperfect as to render it utterly impossible to execute it. Is such the fact with respect to the law of the 15th July, 1795? The substance of the first section has been already noticed. The second section provides that before the writ is issued, an *428 affidavit shall be made, and filed in the Clerk’s office, which shall contain certain facts, as pointed out in the section.
The third section relates to two or more persons, whether partnership debtors or otherwise. Prescribes the manner in which their property shall be attached, and provides that the lands, &c. of such debtors, or either of them, may be taken for the satisfaction of any just debt, or other demand, “ and may be sold to satisfy the same.”
• The fourth section provides that no judgment shall be entered until the expiration of twelve jnonths. In the mean time notice of the pendency of the suit is to be published, and the form of the notice is prescribed. By it the debtor is to be notified that unless “ he shall appear, by himself or his attorney, to give special bail to answer such suit, that then judgment will be entered against such debtor or debtors by default, and the estate or estates attached be sold for the satisfaction of all creditors who shall appear to be justly entitled to a demand thereon, and shall apply for that purpose.”
And the last section secures to the defendant in attachment the right, at any time within twelve months after the attachment shall have been determined, to contest by suit any claim which may have been allowed against him, and paid, and if wrongfully paid to recover back the amount.
Now this law does not, it is true, go so far into detail as to describe every particular step to be taken from the commencement to the final end of the suit, but it authorizes the issuing of an attachment, the seizure of the property of the debtor, a judgment against him, the liquidation of all claims presented against him, the sale of the property attached, and the distribution of the avails amongst the creditors. It is a law which may be executed. The mode of liquidating the claims, of the sale of the property, and other matters relative to the business, might well be provided for by rules of Court. And that such was the fact we may well infer from the circumstance that when this act was repealed by the territorial law of 1802, the repeal *429 ing clause contains this proviso, “ That nothing herein contained shall affect the proceedings in any attachment now pending and undetermined; but the same shall be continued, and ducted according to the rules and practice established under the acts of the Territory heretofore in force.” What these rules were, and what this practice was, we cannot know at this distance of time, nearly fifty years, or perhaps more, having elapsed since the same were established. They were such however as were recognized as obligatory by the law making power. All the knowledge we can have of them must be derived from the records of the Court, and these are, generally speaking, somewhat imperfect. Counsel for the plaintiff seem to suppose, that the course of practice adopted in the case now before us, was in conformity with and controlled by the law of 1802. It would perhaps be as reasonable to suppose that that law was, in many of its details, but the adoption by the Territorial Legislature of the rules and practice which had previously prevailed in the Territorial Courts, in like cases. This however is all matter of conjecture. In the opinion of the Court, the law of the 15th July, 1795, was not void, but under its provisions, the Courts of the Territory might acquire jurisdiction in cases <5f attachment.
It is further objected to the proceedings in attachment, that, admitting the attachment laws adopted by the Governor and Judges to have been in force at the time these proceedings were instituted, still that there was no writ or affidavit as required, and therefore the Court did not acquire jurisdiction. The facts relative to this part of the case appear to be these, as collected from the record and evidence in the case. An.affidavit as required by the law, was made before one of the Justices of the Court of Common Pleas, on the 31st of January, 1801, upon which the writ issued, returnable at the February Term following. This affidavit is not inserted in the record, but is produced in evidence. The Clerk of the Court who issued the writ, instead of dating it on the day on which it was issued, dated it as of the last day of the preceding Term of the Court, to wit, *430 the 21st of November, 1801. Whether such was the usual of that day I do not know. It might have been, or Clerk might have supposed it necessary, under the phraseology of the attachment law, that the lands, tenements, &c. might be attached, “ by a writ or writs to be issued out of the General Court, or any Circuit Court, or Court of Common Pleas,” &c.
If we consider this case, as it appears from the record, and assume the 21st of November to have been the date of the writ, a question arises as to the sufficiency of the writ, it not being recited that affidavit had been made, and no affidavit appearing upon the record. The law authorized the writ to be issued upon affidavit filed with the clerk, but there was no law prescribing, that this affidavit should be made part of the record. The writ recites “ whereas James Smith and James. Findlay have testified to the Court of Common Pleas, at Cincinnati, in the County of Hamilton aforesaid,” &c. Now if we proceed upon the assumption that the writ must be issued out of the Court, as if it were the act of the Court or done by its order, the recital shows that before it was issued, preliminary proof was made.
How made ? We must suppose it to have been made in the manner required by law. Taking the record itself then, it sufficiently appears that an affidavit was filed. Taking the other evidence in the case, however, and admitting it to be competent, what does it show? simply that an affidavit was made as the law directs before a Justice of the Court of Common Pleas, and was filed with the clerk. It bears date, however, at a time subsequent to the date of the writ. Further than this, it appears that the writ itself, though dated in November, IS00, was not actually issued until the latter part of January, 1801, and after the date of the affidavit. It is objected, however, that it should have been issued “from the Court,” or by its order. By a law “ establishing courts of judicature,” which took effect Oct. 1, 1795, in the 16th section it is provided “that every of said justices shall be and are hereby empowered to grant, under *431 the seal of their respective Courts, writs of replevin, writs of partition, writs of view, and all other writs and process upon the said Pleas and actions, cognizable in the said Courts, as occasion,” &c. It may have been, that under the cotemporaneous construction of this section of the statute, the Justice of the Court of Common Pleas before whom the affidavit was made, authorized, so far as any authorization was necessary, the issuing the attachment in this case. How far this practice of dating writs, as of the previous term of the Court prevailed in the territorial Courts, I do not know, nor is it necessary for us to inquire. It was probably found to be attended with inconvenience as we find at the first session of the General Assembly under the State government, in an “ act organizing Judicial Courts,” it was provided, “ that all writs and process shall run in the style of the State of Ohio,-County, ss, shall bear tept in the name of the presiding Judge, be sealed with the seal, and signed by the clerk of the proper Court, and shall be dated on the day on which the same may issue.”
Upon a careful examination we are satisfied that under the attachment law then in force, a writ of attachment was properly issued from the Court of Common Pleas of Hamilton county, at the suit of Smith and Findlay v. Thomds Cochran, that the same was levied upon the land in controversy, and the writ properly returned, whereby that Court acquired jurisdiction of the case, and were authorized to proceed therein.
The next ground of objection is that notice of the pendency of the suit was not given as required by Jaw. If this were true it would undoubtedly render the proceeding and judgment erroneous, but would it render them void ? This question was fully considered in the case of Paine’s Lessee v. Moreland, 15 Ohio Rep. 435 ; in which it is expressly decided, that the Court acquires jurisdiction in attachment, by the issuing of process, predicated upon the requisite affidavit, and the attaching of property ; and if, after thus obtaining jurisdiction, the Court proceed to render judgment, without the publication of notice, such judgment is not void, and cannot be impeached collaterally, but *432 must be reversed upon writ of error. This decision is fully-sustained by the Supreme Court of the United States, in the case of Vorhees v. Bank U. S., 10 Peters Rep. 449. Under the law in force at the time of these proceedings it was not necessary that proof of notice should constitute any part of the record. That law required that a publication should be made in a newspaper printed in the Territory, in one printed in Kentucky, and one printed at the seat of government of the United States. It is in proof that publication was made in a newspaper printed in the Territory, and it would not be too much to presume that the law was complied with, as to the other publications. But as the judgment cannot be collaterally impeached on this ground, it is unnecessary to dwell further upon the point.
It is further objected that there was no judgment. One of the transcripts of records produced in evidence, shows that there was a formal judgment. But it is claimed that this is of no avail, inasmuch as there had been a previous record made, and in that record this judgment did not appear. It seems that the Court of Common Pleas of Hamilton county, at the November Term, 1836, upon inspection of the docket entries, and the record previously made, and finding the latter to be imperfect, directed the clerk to make a more perfect record, and where upon the docket entry at a particular term the letters “ judg’t.” are written to enter the judgment in form, and where in the same term the entry is made “ Report of auditors filed, order of sale to issue,” to enter, such order in full, &c. The whole amount of this order of the Court of which much complaint is made is, that the clerk made out a correct record from the papers on file and the docket entries in the case. I cannot see any thing wrong in this. It seems to me to have been proper, and such course is sustained by this Court in the case of Mitchel v. Eyster, 7 Ohio Rep. pt. 1, 258. It is said that the word “judgment ” written in full upon the docket, or abbreviated, is of no avail and as nothing, but that every judgment must be formally entered, before it can be noticed. If so, then in some of our sister States and especially in the State *433 of Pennsylvania there are but few valid judgments. For in most of the transcripts of record which I have seen from State, there is no evidence of any judgment, except the “ judg’t.” And to this day in the county in which these proceedings were had, in most of the transcripts which are sent to this Court from one of the inferior Courts, there is no evidence of any judgment except the word “ judgment ” or the letters “judg’t”
The next objection is that there was no order of sale. This is not true in point of fact if what is called the new record is considered as being in evidence.
It is next claimed that the death of Cochran, before the rendition of judgment, put an end to the proceedings, and that a judgment subsequently rendered is void, and it is further insisted as a general principle that a judgment against a dead man is void. The death of a party before judgment, is in the books, said to render the judgment erroneous, and is one of those errors in fact for which a judgment may be reversed. If void, why reverse it ? I take the law to be this: such a judgment may in some instances be held to be void as to strangers, but is merely erroneous as to parties and privies, and this is the distinction taken in 4th Cowen’s Rep. 286, to which we have been referred. Now the lessors of the plaintiffs, are the heirs of Cochran. They stand in the relation of privies to this judgment. But were it otherwise, inasmuch as this attachment proceeding is a proceeding in rem, I should be unwilling to say that the death of the debtor, after the property is attached, would prevent the Court from proceeding to liquidate the claims presented, and distribute the avails of the property according to the meaning and intent of the law under which the proceedings were had. To put this matter be yond controvery, the Legislature, in subsequent attachment laws, have expressly provided that the death of the debtor shall not put a stop to the proceedings.
Another objection is that there was no deed properly executed to vest the land in the purchaser. The record shows that *434 auditors were appointed to hear and adjust the claims of credi’tors. This was certainly a convenient way of adjusting these claims, and as the law made no provision on the subject, by a rule of practice, the Court might well adopt it. And this was probably in the mind of the Territorial Legislature when the proviso to the repealing law of 1802, which has been already referred to, was adopted. These auditors made their report to the Court, upon which judgment was entered, and an- order of sale made. This was directed to the auditors. For this it is said there was no law. In fact the law, so far as we know any thing about it, although it directed that the property should be sold, gave no directions as to the manner of sale, nor as to the person or persons by whom the sale should be effected. This was left to the discretion of the Court. The property had been attached, it was in the custody of the law, the Court were bound to see that the avails were distributed. To effect this object, they directed the auditors to make the sale. I am not aware that in thus proceeding they were guilty of exercising any greater excess of power, than this Court sometimes does, in directing sales to be made by master commissioners in chancery. For it is not within my recollection that we have ever had any Statute authorizing property to be so sold in such manner, although we have adopted the practice as being incidental to the powers of a Court of Chancery. In pursuance of this order of sale, the auditors made sale and executed a deed to the purchaser, which was acknowledged in open Court, and the whole was approved by the Court- ordering the sale. So far I see nothing wrong.
But it is said, and such appears to be the fact, this deed was without witnesses. Is it void on this account? At the time this deed was executed, it was required, in ordinary cases, if not in every case, that a deed should be attested by two subscribing witnesses. But from 1795 to 1805, no witnesses were necessary, provided the deed was acknowledged as the law required. (1 Ohio R. 1, Lessee of Moore v. Vance.) Such was the law at the time these proceedings in attachment were instituted. *435 When the law under which these proceedings were instituted, was repealed, it was under this proviso, “That nothing contained, shall affect the proceedings, on any attachment pending, and undetermined, but the same shall be continued according to the rules and practice established under the acts of the Territory heretofore in force.” This saving clause may have been construed to extend as well to the proceedings after judgment, in the disposition of the property, as to the proceedings before judgment; nor would this be a forced construction, as the case must be continued in Court until the property attached had been disposed of, and the avails distributed. At the time these proceedings were instituted, the law did not require, for the validity of a deed, that the same should be attested by witnesses, and it may with much plausibility be urged, that for this particular class of cases this principle of law was continued in force. When we consider that under the attachment law of July, 1795, there was no provision made as to the manner in which property should be conveyed after it had been sold, although the sale was expressly required, when we consider further, that at the time of the institution of these proceedings no attesting witnesses were necessary to the validity of a deed, and further that this conveyance was made under the direction and approval of the Court having jurisdiction of the whole matter, we are not prepared to say, that this deed was no evidence of title. It was but one of the items in the course of judicial proceedings, by which the property of Thomas Cochran was appropriated to the payment of his debts. There can be no doubt that the property was, by the attachment, in the custody of the law; that it has been sold pursuant to the law ; that it was purchased by those under whom the defendants claim title ; that it has been in their possession, and in the possession of those under whom they claim, for about forty years, and as before remarked, we are not prepared to say that they have not the legal title.

The judgment of the Superior Court is affirmed.

Read, J., dissented.